**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

GARRY B. AIKEN, SR.,            )
    Petitioner,              )
                         )
       v.                   )  Civil Action No. 04-562
                         )  (Criminal No. CR 99-60-1)
UNITED STATES OF AMERICA,       )
    Respondent               )

**MEMORANDUM**

Garry B. Aiken, Sr. ("Petitioner"), acting *pro se*, moves under 28 U.S.C. § 2255 to vacate, set aside, or correct the sentence of imprisonment imposed upon him by this Court on October 10, 2000.  For the reasons set forth below, Petitioner's motion is denied.

## I.   BACKGROUND[1]

Shortly after 9 a.m. on July 3, 1998, two armed men robbed The First National Bank of Herminie located in Greensburg, Pennsylvania.  According to an eyewitness, the robbers fled in a 1990 silver or gray Ford Taurus.  At the time of the robbery, Petitioner was shopping and following up on a job application at a Wal-Mart store in Greensburg.  When he left the store at approximately 9:30 a.m., his 1990 gray Ford Taurus was missing from the parking lot.  Mr. Aiken reported the missing car immediately to the Pennsylvania State Police who soon found it abandoned on Mt. Thor Road near Greensburg.

---

[1] Unless otherwise noted, the facts in this section are undisputed. Additional facts will be discussed in the analysis which follows.

1

The subsequent police investigation led to the conclusion that Mr. Aiken and the two bank robbers, James McNair ("McNair") and Blaine Gamble ("Gamble"), had arranged the "theft" of Petitioner's car to use in the robbery, and that Mr. Aiken had deliberately established an alibi for himself by conspicuously interacting with numerous Wal-Mart employees and making a small purchase.  However, the police investigation also discovered that Mr. Aiken's girlfriend, Michelle Pearson ("Pearson"), was Gamble's cousin and that Gamble and McNair had been seen at or in her apartment on several occasions in the weeks just before the robbery, even though both of them were residents of New Jersey. The evidence eventually led to the arrest of Gamble, McNair, and Mr. Aiken in connection with the robbery.

Petitioner was indicted for conspiracy to commit bank robbery, conspiracy to commit armed bank robbery, and aiding and abetting a bank robbery.  Following a jury trial at which Mr. Aiken was convicted on all counts, he was sentenced on October 10, 2000, to a prison term of 66 months and three years' supervised release.  (Docket Nos. 204, 206.)  Throughout these legal proceedings, Mr. Aiken was represented by Federal Public Defender Jay J. Finkelstein, Esq.

Mr. Aiken timely appealed his conviction and sentence to the Third Circuit Court of Appeals, which confirmed his conviction on December 18, 2001.  (United States v. McNair, No. 00-2147, No.

00-2284, No. 00-3602, 281 F.3d 225, 2001 U.S. App. LEXIS 27897 (3d Cir., Dec. 14, 2001) (unpublished); *see also*, slip op. at Docket No. 263, "Slip Op.")  Following an unsuccessful petition for rehearing *en banc* (Docket No. 267), Mr. Aiken filed a petition for a writ of certiorari with the United States Supreme Court on May 22, 2002; the Court denied that petition on January 21, 2003.  (Aiken v. United States, 537 U.S. 1161 (2003); *see also*, Docket Nos. 271, 272.)

Under 28 U.S.C. § 2255, Mr. Aiken had one year from the date of the Supreme Court decision on certiorari to file his motion to vacate, that is, by January 21, 2004.  Mr. Aiken's motion was filed with this Court on April 5, 2004.[2]  (Petition under 28

_____

[2] The Government argues that calculating from the date on which the Supreme Court denied certiorari, Petitioner's motion is untimely. (Govt. Resp. at 26-29.)

On December 21, 2003, Mr. Aiken's cell at the Federal Correctional Institution at Cumberland, Maryland, was inspected and, according to Petitioner, his legal research and draft Petition were removed by the prison guard.  He immediately contacted the Court to explain the situation (Docket Nos. 283, 284), and was advised that if his Petition were filed by April 7, 2004 (one year from the date on which denial of his writ of certiorari was filed in this Court), it would be considered to have been filed on a timely basis.  (Retort, Exhibit B.)

Equitable tolling of the one-year statute of limitations for filing a petition under § 2255, paragraph 6, applies "when the principle of equity would make the rigid application of a limitation period unfair."  Miller v. New Jersey State Dep't of Corrections, 145 F.3d 616, 618, 619 n.1 (3d Cir. 1998).  However, such tolling is available only if the petitioner can prove that he has in "some extraordinary way been prevented from asserting his ... rights" and that he "exercised reasonable diligence in investigating and bringing [his] claims."  Id. at 618; *see also*, Fahy v. Horn, 240 F.3d 239, 244 (3d Cir. 2001).  In the case of a petitioner in custody, the "prison mailbox rule" provides that a pleading is deemed filed with the Court as of the date it is delivered to the prison mail room.  Houston v. Lack, 487 U.S. 266, 275 (1988).  In this case, the delivery was made on April 5, 2004, and the Petition was mailed on April 7, 2004, thus making it timely according to the timetable established by the Court.

Because the Court finds that each of Mr. Aiken's arguments is meritless under the Strickland standard, the timeliness issue is not addressed, having assumed for sake of analysis that Mr. Aiken was reasonably diligent in filing

U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence by a
Person in Federal Custody, "Petition," Docket No. 285.)  The
United States filed its response on May 14, 2004 ("Govt. Resp.,"
Docket No. 289), and Mr. Aiken subsequently filed a Retort to
Government's Response to Vacate under 28 U.S.C. § 2255 ("Retort,"
Docket No. 300.)

In his Petition, Mr. Aiken raises only a single legal
issue,[3] that is, ineffective assistance of counsel which denied
him of his constitutional rights under the Sixth Amendment to the
United States Constitution.[4]  Briefly stated, Petitioner claims
that Mr. Finkelstein:

> Advised him not to testify at trial, contrary to
> Petitioner's express desire to do so, and threatened to
> withdraw from his case if Mr. Aiken insisted on exercising
> his constitutional right to testify in his own defense;

> Failed to present two witnesses on Petitioner's behalf,
> despite their willingness to appear at his trial;

> Failed "to object to the Court going beyond the prescribed
> rule given during voir dire" (Petition at 5);

his Petition within the time stated by the Court.

[3]  There is a brief foray into denial of due process under the
Fourteenth Amendment to the United States Constitution in Petitioner's Retort
at 6-8, which is addressed in Footnote 11 below.

[4]  In relevant part, 28 U.S.C. § 2255 provides: "A prisoner in custody
under sentence of a court established by Act of Congress claiming the right to
be released upon the ground that the sentence was imposed *in violation of the
Constitution or laws of the United States*, or that the court was without
jurisdiction to impose such sentence, or that the sentence was in excess of the
maximum authorized by law, or is otherwise subject to collateral attack,
may move the court which imposed the sentence to vacate, set aside or correct
the sentence."  (Emphasis added.)

Failed to correct the Government's "false and/or grossly misleading opening and closeing [sic] arguments" (Petition at 6), which led the jury to believe that Petitioner knew McNair and Gamble prior to the robbery;

Failed to advise Petitioner of his right to impeach Government witnesses, specifically Tina Jo Pasparage ("Pasparage") and Joseph Ball ("Ball"); and

Failed to obtain exonerating affidavits or testimony from Gamble and Blaine.

In response to Petitioner's contentions, the Government argues that each claim of ineffective assistance of counsel raised by Mr. Aiken fails to satisfy the standard set forth in Strickland v. Washington, 466 U.S. 668 (1984).

## II.   STANDARD OF REVIEW

Mr. Aiken concedes that the two-prong test for ineffective assistance of counsel set forth in Strickland establishes the standard of review for his appeal under § 2255.   (Retort at 2.) Although he slightly misstates the two prongs of the Strickland test, it is clear from the arguments in the remainder of his Retort that he understands the general principles of that case.

The Sixth Amendment to the United States Constitution provides, *inter alia*, that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST., amend. VI.  The Supreme Court has noted that "[t]he right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord

defendants the ample opportunity to meet the case of the prosecution to which they are entitled." Strickland, 466 U.S. at 685, internal quotation omitted.  The Court has further recognized that the Sixth Amendment provides the right to effective assistance of counsel and that a defendant may be deprived of this constitutional right when his attorney simply fails to render "adequate legal assistance." Strickland, id. at 686, *citing* McMann v. Richardson, 397 U.S. 759, 771, n.14 (1970), and Cuyler v. Sullivan, 446 U.S. 335, 344 (1980).  The purpose of the requirement for effective assistance is to ensure a fair trial; thus, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, id.

Under Strickland, a petitioner must show first that his counsel's performance was deficient, i.e., that it "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 687.  Second, the petitioner must show that this deficient performance so seriously prejudiced the defense that he was deprived of a fair trial, i.e., "a trial whose result is reliable." Id.  This degree of prejudice is established when the petitioner shows that there is a "reasonable probability," i.e., "a probability sufficient to undermine confidence in the

outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694. Failure to satisfy either prong of the test will defeat a petitioner's claim of ineffective assistance of counsel and both do not need to be addressed by the reviewing court if it is clear that the defendant makes an insufficient showing on either one. Id. at 697.

In reviewing counsel's performance under a motion to vacate, the court "must be highly deferential" to tactical and professional decisions made by the petitioner's attorney. Strickland, 460 U.S. at 689.  This is because

> [i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Strickland, 466 U.S. at 689, internal citation and quotation omitted.

Thus, when a court decides an ineffectiveness claim, it must "judge the reasonableness of counsel's challenged conduct on the facts of a particular case, viewed as of the time of counsel's conduct" and determine if, "in light of all the circumstances, the identified acts or omissions were outside the wide range of

professionally competent assistance."  Strickland, 466 U.S. at
690; see also Duncan v. Morton, 256 F.3d 189, 200 (3d Cir. 2001)
(performance is judged by "an objective standard of
reasonableness, viewed to the extent possible from the attorney's
perspective at the time, without the distorting effects of
hindsight.")  Under such a highly deferential standard, only a
"rare claim" of ineffective assistance of counsel is likely to
succeed.  United States v. Kauffman, 109 F.3d 186, 190 (3d Cir.
1997).

## III. ANALYSIS

In general, the Court finds that Petitioner has satisfied
the requirement set forth under Strickland that he identify the
specific errors made by Mr. Finkelstein which allegedly resulted
in ineffective representation.  Applying the standard set out in
Strickland, the merits of Mr. Aiken's claims will each be
examined in turn.

   A.   Claim One: Counsel Prevented
        Mr. Aiken from Testifying at Trial

According to Mr. Aiken, when he "voiced his desire" to
testify at trial on his own behalf, Mr. Finkelstein not only
adamantly opposed this decision but stated, "Garry if you insist
on taking the stand, I'm telling you Garry, I'm going to withdraw
from this case.  I'll just walk away.  I don't want you anywhere
near that stand."  (Petition at 5.)  Petitioner concedes that

counsel is not necessarily ineffective by simply advising his
client not to testify, but argues that the defendant retains "the
ultimate authority to make certain fundamental decisions
regarding the case," including whether or not to testify.
(Retort at 2, *citing* United States v. Joelson, 7 F.3d 174, 177
(9th Cir.), *cert. denied*, 510 U.S. 1019 (1993)); *see also*, United
States v. Pennycooke, 65 F.3d 9, 11 (3d Cir. 1995) (same).  He
contends that Mr. Finkelstein's ultimatum that he would  withdraw
from the case if Mr. Aiken insisted on testifying placed him in
the untenable and unconstitutional position of choosing between
continuing the trial without counsel or declining to testify.  He
concludes that he was thus forced to barter one right for another
in violation of the law.  (Retort, id., *citing* Wilcox v. Johnson,
555 F.2d 115, 120-21 (3d Cir. 1977).)

     The Government in turn concedes that a defendant's
constitutional right to testify in his own behalf can be waived
only by the defendant, not defense counsel.  (Govt. Resp. at 11,
*citing* United States v. Leggett, 162 F.3d 237, 245 (3d Cir.
1998).)  It further concedes that if Mr. Finkelstein had in fact
threatened to withdraw from the case if Petitioner insisted on
testifying, he would likely be deficient under the first prong of
the Strickland test.  However, the Government contends that Mr.
Aiken would have been found guilty even if he had taken the stand
in his own defense.  Thus, Mr. Finkelstein's conduct could not

have been so deficient that it would have changed the outcome of the trial.  (Govt. Resp. at 11-12.)

Mr. Aiken claims that his testimony would have refuted that of Government witnesses on three separate points.  First, one of the Government's theories at trial was that the defendants had identified a drop spot for Mr. Aiken's car prior to the robbery. Dana Rodericks ("Rodericks") testified that he saw a gray Ford Taurus with fancy wheel rims and no license plate parked near his home on Mt. Thor Road (near where the car was later found abandoned) between 6:30 and 6:45 a.m. on several days in the two-week period before the robbery.  (Retort at 3; see also, Transcript of Trial Proceedings, "TT," March 27, 2000, Docket No. 217, at 759-760.)   Rodericks testified that he later identified the abandoned car belonging to Mr. Aiken as the one he had seen on Mt. Thor Road, based on the custom rims.  (Id. at 760.)  On cross-examination by Mr. Finkelstein, Rodericks admitted that when he saw the gray Ford Taurus on Mt. Thor Road before the robbery, he did not see anyone with the car, did not know why it was there, and did not know to whom it belonged.  (Id. at 763.)

Mr. Aiken argues he would have testified that during the period when Rodericks allegedly saw his car parked on Mt. Thor Road early in the morning, he was enrolled in classes at Westmoreland County Community College in Youngwood, Pennsylvania, and that his normal commuting time was forty-five to fifty

minutes.  Furthermore, his testimony on this point could have
been substantiated in turn by college attendance records,
evidence from Mr. Aiken's neighbors about his normal departure
time, and evidence from employees and security videotapes at a
convenience store where he habitually stopped for coffee.
Petitioner claims that this testimony was discussed with Mr.
Finkelstein but "obviously dismissed."  (Retort at 3.)  Although
it is somewhat unclear from his narrative, he seems to argue that
his testimony in this regard would have been that his car could
not have been parked on Mt. Thor Road as late as 6:45 a.m.
because he would have to leave by that time in order to meet his
8:00 a.m. classes.  Thus, Petitioner's car could not be the one
Rodericks had seen parked on Mr. Thor Road, despite the
similarity in wheel rims.

    It is unclear what Mr. Aiken's testimony on this subject,
even if it had been accompanied by the college records and
corroborating testimony of others regarding his normal
activities, would have accomplished in his favor.  There is no
question that Mr. Aiken's car was found abandoned on Mt. Thor
Road soon after the robbery, that Rodericks identified it as the
same car he had seen earlier, and that Mr. Aiken's car was the
get-away car, based on the testimony of an eyewitness who had
noted the license plate number as the car left the bank parking
lot.  (TT, 3/27/00, at 746.)  Had the jury heard Mr. Aiken's

testimony that he could not have driven his car to Mt. Thor Road on the mornings when Rodericks supposedly saw it, they still could have concluded from other evidence that he was part of the conspiracy to rob the bank, even though the Government had not proven its theory about the robbers pre-determining a drop spot for Petitioner's car.

Secondly, Mr. Aiken claims that he would have testified to the fact that Pearson "would have him sit in the car as opposed to going in to her apartment, also that she had borrowed his car on several occasions." (Retort at 3.)  According to Petitioner, his testimony would have corroborated that of Krista Sue Shreve ("Shreve") who lived in the apartment next door to Pearson. Shreve testified that (1) she never saw Mr. Aiken with Gamble or McNair and (2) she had seen Pearson driving Mr. Aiken's car without him in it.  (TT, March 28, 2000, Docket No. 218, at 935-936.)

Again, it is unclear from Petitioner's argument how Mr. Finkelstein's refusal to allow him to testify on these two points prejudiced his case.  According to the Government's position at trial, Pearson was the link between him and the bank robbers. Shreve testified that although she had never seen the defendants together, she saw Mr. Aiken several times at Pearson's apartment where she believed McNair and Gamble were living in the weeks before the robbery.  (TT, 3/28/00, at 920-22.)  She also

12

testified that she had seen a Ford Taurus parked outside
Pearson's apartment at the same time Gamble's car was there.
(Id. at 923-24.)  Had Mr. Aiken testified as he suggests, the
jury would have heard that despite the fact that his car was seen
parked outside Pearson's apartment at the same time as Gamble's,
he did not necessarily know the other defendants, presumably
because such an event could have occurred on one of those
occasions when Pearson took his car, or that while Gamble and
McNair were there, Pearson had him sit in the car rather than
allow him to enter the apartment.  However, Petitioner testified
before the grand jury that "she didn't really come out and say,
'Stay in the car.' Okay?  It was more like, "I'll be right back,'
you know what I mean. . . . The way I took it, . . . there was
no point in everybody piling out of the car, and running in, you
know what I mean, she was coming right back out."  (Govt. Resp.,
Exhibit A, at 20.)  Had Petitioner testified similarly at trial,
such vague testimony would have not definitively established that
Pearson was trying to keep him from learning that Gamble and
McNair were staying at her apartment.

Mr. Aiken's purported testimony would have added nothing
that the jury did not learn from Shreve, a neutral witness.  An
attorney's failure to present repetitious or cumulative evidence
does not create a reasonable probability that the trial's outcome
would have been different.  Hess v. Mazurkiewicz, 135 F.3d 905,

909 (3d Cir. 1998); *see also*, Fed.R.Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by . . . needless presentation of cumulative evidence.")  Although Petitioner never claims that he advised his counsel of what he intended to testify to in this regard, had he done so, it was not unreasonable for Mr. Finkelstein to conclude that such testimony would not significantly advance his client's case.  Thus, Petitioner was not prejudiced by his counsel's failure to call him to testify on this subject.

Finally, Mr. Aiken argues that he would have offered testimony to rebut that of Special Agent Francke[5] of the Federal Bureau of Investigation.  Francke testified that after the FBI became involved in the investigation of Mr. Aiken's claim that his car had been stolen, he and Petitioner were in an interview room at the State Police barracks when Thomas Cessar ("Cessar"), a State Police investigator who had interviewed Mr. Aiken earlier that day, told Francke that Petitioner had received at least two calls on his pager while they were in route to the barracks.  (TT, April 3, 2000, Docket No. 220, at 1130-1131.)  Francke testified that when he asked Mr. Aiken about those messages, Petitioner agreed to call the paging service and retrieve his

---

[5]  Mr. Aiken refers to Mr. Francke as Special Agent "Franckie" throughout his Petition and Retort.

14

messages.  He called the service on a barracks telephone, handed
Francke the receiver, and punched in his PIN number.  Francke
testified that he heard a voice message indicating that Mr. Aiken
had five messages, but after he listened to the first message – a
female voice saying, "Call me at Grandmother's right away" – Mr.
Aiken manipulated the telephone key pad so that Francke heard the
same message four more times, rather than hearing the other
messages.  (TT, 4/3/00, at 1131-1134.)  When Francke told Mr.
Aiken that he thought something was wrong with the message
service, Petitioner began punching other numbers on the telephone
pad.  Francke concluded, "I didn't know what he was doing, but I
thought it was enough time that whatever the problem was, he
should have corrected it.  So I reached for the receiver, and I
heard one more message, a different message. . . [which was]
"'This is Michelle; call me at John's.'"  (Id. at 1134.)  This
message led to a discussion of Petitioner's acquaintance with
Pearson and eventually to the lies he told investigators about
the depth of that relationship.

According to Mr. Aiken's testimony before the grand jury,
when he was first asked during the investigation where he had
been on the evening of July 2, 1998, he replied that he had
visited a friend, John Joyner, but did not mention that Pearson
had been there as well.  (Govt. Resp., Exhibit A at 11.)
However, Francke testified that during the second interview,

15

after he heard the two messages and asked about Michelle's
identity,

> A:   . . all of a sudden [Mr. Aiken] said . . .
> 'Okay, okay.  You know, basically, I lied.
> You know," and went on to say, . . . as an
> explanation for lying – "I'm a member of my
> brother's church."  And saying that he wasn't
> married to her and, you know, it would –
> basically, it would look bad that he was
> sleeping with a woman he wasn't married to.

> Q:   Did you say anything to him about . . . him
> sleeping with her in relation to the church?

> A:   . . . he mentioned that – that he wasn't
> married to her.  He said that . . . they've
> had a relationship for approximately two
> months, as I recall, and —

> Q:   Had you ever told him during the course of
> the interview that you were going to disclose
> this information to anybody?

> A:   No sir.

(TT, 4/3/00, at 1136.)

Mr. Aiken claims that had he testified, he would have
explained that his pager had a reminder-type function that re-
paged him periodically; that what Francke believed to be several
messages were simply iterative reminders of one message asking
him to call Pearson at her grandmother's home; that Francke had
listened to the only message he received at that time; that
Petitioner had not deleted or otherwise thwarted Francke's
attempt to listen to other messages; and that the other messages
were "not the same message being repeated by Mr. Aiken pressing
the same number on the phone, but the same person repeating the

16

same message each time they called." (Retort at 4.) It is
unclear what such testimony would have accomplished to benefit
Petitioner, since the main point of Francke's testimony was not
that Petitioner had deviously manipulated the pager to prevent
Francke from hearing all the messages, but rather that the
messages Francke did hear led to questions about Pearson, which
in turn led to Mr. Aiken's lies about their relationship.

As the Government points out, had Mr. Aiken taken the stand,
he could potentially have done a great disservice to his case.
(Govt. Resp. at 13.) He certainly would have been cross-
examined about his lies to investigators, e.g., his acquaintance
with Pearson, his alibi for the morning of the robbery, and his
alleged habit of leaving his keys in the car. (Id. at 13-14.)
The Government also argues that despite not taking the stand, Mr.
Aiken presented "an extremely effective defense." For example,
Francke testified that during the interviews with Cessar and
himself, Mr. Aiken was cooperative and that the exchange
regarding the pager calls was non-adversarial, testimony which
could have created the impression among the jurors that he was
innocent and had nothing to hide. (TT, 4/3/00, at 1151, 1153.)
Secondly, testimony he could have presented himself was presented
by other witnesses, e.g., his mother testified about his reason
for going to Wal-Mart on the morning of the robbery, and Ball
testified that automobiles had previously been stolen from the

17

same Wal-Mart parking lot.  (TT, 4/3/00, at 1129.)  Finally, in his closing argument, Mr. Finkelstein strongly emphasized the lack of evidence linking Mr. Aiken to McNair or Gamble, thus reiterating Shreve's testimony on this point.  (TT, April 6, 2004, Docket No. 223, at 1437, 1446-1447.)

The cases cited by Petitioner in his Retort are readily distinguishable from his own situation.  As pointed out in Joelson, "although the ultimate decision whether to testify rests with the defendant, he is presumed to assent to his attorney's tactical decision not to have him testify."  Joelson, 7 F.3d at 177.  If, however, a defendant rejects his attorney's advice, he has alternatives other than giving up his right to testify, i.e., he can insist on testifying, he can express his disagreement with his attorney's decision to the court, or he can discharge his lawyer.  Thus, "waiver of the right to testify may be inferred from the defendant's conduct and is presumed from the defendant's failure to testify or notify the court of his desire to do so."  Id.  Assuming for the sake of argument that Mr. Finkelstein did present such an ultimatum to Mr. Aiken, the record shows that, contrary to his assertion that he either had to proceed without counsel or give up his right to testify, Mr. Aiken did not insist on testifying, did not advise the Court of the ultimatum, and did not discharge Mr. Finkelstein.  Thus, he is presumed to have

assented to the tactical decision of his attorney to keep him off the witness stand.

Wilcox v. Johnson is equally distinguishable.  There, just before closing arguments, the defendant disagreed with the decision by his attorney, Ms. Temin, not to put him on the stand. In a sidebar conference, Temin advised the trial judge that if Wilcox were permitted to testify over her objection, she would make a motion to withdraw as counsel because she believed he would offer perjured testimony.  Wilcox, 555 F.2d at 117 and n4. Temin then advised her client that the trial judge had decided that if he insisted on testifying, she would be permitted to withdraw and he would have to represent himself.  Id.  As the Court of Appeals found, it was the trial judge, not the attorney, who had conditioned the defendant's right to testify on the waiver of his constitutional right to counsel.  In sum,

> Mr. Wilcox was entitled both to testify in his behalf and to be represented by counsel.  If the Trial Judge believed that upon [defendant's] taking the stand, defense counsel should have been permitted to withdraw from the case, then Mr. Wilcox was entitled to substitute counsel.  The threatened loss of counsel here not only violated [defendant's] Sixth Amendment rights but worked as a lever to pry from [Wilcox] his statutory right to testify.

Wilcox, 555 F.2d at 120-121.

Here, nothing in the record shows that the trial judge was aware of Mr. Finkelstein's purported ultimatum, much less that he

19

would have permitted his withdrawal without appointment of substitute counsel.

In sum, the testimony Mr. Aiken argues he would have presented in his defense was either irrelevant to the charges brought against him, cumulative of evidence presented by other witnesses, or would not have significantly improved his case. Thus, he was not prejudiced by his attorney's insistence that he not take the stand.  Moreover, because he did not avail himself of alternative courses of action which would have allowed him to have substitute counsel if Mr. Finkelstein had acted upon his purported threat to withdraw, Petitioner is presumed to have concurred in that decision.

B.   Counsel Failed to Effectively Advise
         Petitioner of his Right to Present Witnesses

Mr. Aiken contends that Mr. Finkelstein had subpoenaed two witnesses, Pearson and Eugene Cooper ("Cooper"), to appear on his behalf.  Both agreed that they were willing to testify in his defense and Cooper traveled from Greensburg to Pittsburgh in order to do so.  However, Mr. Finkelstein failed to call either potential witness.  (Petition at 5.)  Petitioner argues that Mr. Finkelstein should have called these people as witnesses but did not, therefore his performance was deficient.  (Retort at 5.)

Mr. Aiken argues first that Pearson would have offered testimony "of great favor to him given the testimony that was

20

offered about her" by Government witnesses Gregory Montgomery

("Montgomery") and Shreve.  (Retort at 4.)   Montgomery testified

that he was related to both Gamble and Pearson.  (TT, 3/28/00, at

906-907.)  He also knew Mr. Aiken and had seen him with Pearson

in 1998 at the home of a mutual friend, John Joyner.  (Id. at

907-909.)  Mr. Aiken does not dispute either of these points.  On

cross-examination by Mr. Finkelstein, Montgomery testified that

he never saw Mr. Aiken with Gamble or McNair.  (Id. at 911.)

Contrary to Mr. Aiken's assertion (Retort at 4), Montgomery did

not testify that he saw Pearson and Gamble talking together, but

rather that in the summer of 1998, he saw Gamble speaking to his

(Montgomery's) mother.  (TT, 3/28/00, at 911.)

    According to Mr. Aiken, Shreve testified that she saw

Pearson "shortly after the robbery with a man dressed as a woman

leaving Michelle's apartment together in a hurry."  (Retort at

4.)  With regard to this event, Shreve testified that one or two

days before July 4, sometime between 11 a.m. and 2 p.m., she saw

Pearson hurry from her apartment, followed shortly by a person

carrying a big suitcase.  At first, Shreve thought the second

person was an older woman, but later concluded it was a man.

Shreve saw him and a tall, lanky black man go the parking lot

and, together with Pearson, get into a car belonging to Gamble.

(TT, 3/28/00, at 924-928).  On cross-examination by Mr.

Finkelstein, Shreve testified that she could not tell if either

of the men she saw leaving Pearson's apartment was Mr. Aiken because she couldn't see their faces and that the car Pearson and the two men entered was not a Ford Taurus.  (Id. at 935-936.)

Mr. Aiken does not explain either (1) what Pearson would have testified on these two subjects that would have been "of great favor to him" or (2) how Mr. Finkelstein's decision not to call her to testify was prejudicial to him.  He does not offer an affidavit from Pearson explaining what her testimony would have been.  It is not enough to claim, as Petitioner does, that "one need only apply common sense in this matter" (Retort at 4) in order to support his motion to vacate.  United States v. Thomas, 221 F.3d 430, 437 (3d Cir. 2000) ("vague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the District Court.")

The claim that Cooper's testimony would have "added greatly" to Petitioner's defense is equally weak.  The jury had already heard from Francke that when he heard the two messages from Pearson asking Petitioner to call her and asked Mr. Aiken who she was, he at first denied knowing her well, but later confessed that they had spent the evening of July 2 with John Joyner, then stayed together at Petitioner's home that night.  (TT, 4/3/00, at 1136.)  When confronted with this inconsistency, Mr. Aiken told Francke that he had lied because he did not want his brother, the

pastor of a local church which Petitioner and Pearson attended, to know that they had stayed together.

Mr. Aiken explains that Cooper's testimony would have informed the jury that Petitioner began leadership classes at the church only after he broke off an earlier relationship with Tina Pasparage.  Cooper, who supervised the leadership classes, would have testified that had Mr. Aiken's subsequent relationship with Pearson become known, he would been disqualified from continuing with the classes.  (Retort at 5.)  Mr. Aiken provides a notarized statement from Cooper in which he indicates that had he been called as a witness,

> [t]he purpose of my testimony was to verify to the courts that Mr. Aiken was not lying concerning his statement regarding leadership at the former Word of Victories Ministry.  He stated that the reason he denied being at his girlfriend Michelle's house the night in question was because he did not want the people of the church to know that he was fornicating (having sex outside of wedlock).  As a former Elder of the Word of Victories I am writing to you to verify that if you were considering any position of leadership within the church, fornication was forbidden not only by the church but by the natural order of God's holy word.

(Verification of Statement, Docket No. 288.)

Even if Cooper had testified as stated above, he would have added nothing the jury had not already heard.  That is, calling Cooper to testify that Mr. Aiken did not want his brother to know Pearson had been living with him because such a relationship was against the tenets of his religion would have been merely

cumulative since the jury was already aware from Francke that this was Petitioner's purported reason for initially lying to investigators.

"The Constitution does not oblige counsel to present each and every witness that is suggested to him."  United States v. Balzano, 916 F.2d 1273, 1294 (7th Cir. 1990)(observing that "such tactics would be considered dilatory unless the attorney and the court believe that the witness will add competent, admissible, and non-cumulative testimony to the trial record"); Duncan v. Morton, 256 F.3d 189, 201 (3d Cir. 2001)(citing Strickland and concluding that counsel's failure to use certain testimony "amounted to a tactical decision within the parameters of reasonable professional judgment").  I conclude that Mr. Finkelstein's decision to refrain from calling either Pearson or Cooper was within the scope of professional judgment and thus cannot be said to have resulted in ineffective assistance.

C.   Counsel Failed to Object to the Court Going
     Beyond the Prescribed Rule Given During Voir Dire

Mr. Aiken acknowledges that during voir dire, his counsel properly raised an objection to dismissal of Charles Leonard ("Leonard"), a black member of the jury pool.  (Retort at 5.)  Based on Mr. Finkelstein's objection under Batson v. Kentucky, 476 U.S. 79 (1986),[6] the Court initially ruled in favor

---

[6]  In Batson, the Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable

of Petitioner and Leonard remained on the jury.  However, Mr.
Aiken claims that the prosecutor's answer to the Batson challenge
"went far beyond the prescribed three steps and Counsel for
Petitioner failed to remedy this." (Petition at 5.)  That is,
when the prosecutor continued to argue for Leonard's dismissal
following the Court's initial decision in Petitioner's favor, Mr.
Finkelstein failed to offer effective counsel because he did not
object to the ongoing argument and nor to the fact that the
prosecutor "change[d] his argument to suit the questions that
this Court had when the original exchange took place." (Retort
at 5.)

    A review of the transcript of the voir dire proceedings
shows the following.  One of the questions posed to all potential
jurors was "Do you believe that African-Americans are treated
unfairly either by law enforcement personnel or the criminal
justice system in general?" (Govt. Resp., Exhibit C at 27,
"Question 21.")  As the parties began their strikes, the
Government used its third peremptory strike to remove Leonard, a

---

impartially to consider the State's case against a black defendant." Batson,
476 U.S. at 89.  The Court laid out a three-step process for use by trial
courts in determining whether racial discrimination in peremptory challenges
has occurred: (1) defense counsel must make a *prima facie* showing of
purposeful racial discrimination by the prosecution by showing that the
defendant is a member of a "cognizable racial group," thus raising an
inference that the peremptory challenge was intended to exclude the juror "on
account of [his] race;" (2) the prosecution must then give a race-neutral
explanation for the contested challenge; and (3) the trial judge must
determine whether the defendant has established purposeful discrimination.
Id. at 87-88.

step which all defense counsel, including Mr. Finkelstein, challenged under <u>Batson</u>.  The prosecutor explained to the Court that he had previously struck two white jurors, both of whom, like Leonard, had affirmatively answered Question 21. (Transcript of Jury Selection, March 20, 2000, Docket No. 214, at 412-413.)  Counsel argued their respective positions at great length, and the Court initially determined that Leonard would remain on the jury.  (<u>Id.</u> at 413-420.)  However, following further discussion of this matter and relevant case law, the Court determined that the matter would be re-visited after all the strikes were made and the attorneys had an opportunity to review the law.  (<u>Id.</u> at 427-428.)

     The attorneys met with the Court again on March 22, 2000, to continue the discussion of striking Leonard.  At this point, the prosecutor had stricken five of the six jurors who had answered Question 21 affirmatively, four of whom were white and one black. (Transcript of Jury Selection, March 22, 2000, "Tr. 3/22/00," Docket No. 215, at 442.)  His reasons for striking each of them and for not striking the remaining juror (like Leonard, a black male) were explained in detail to the Court and defense counsel, as was the relevant law.[7]  (<u>Id.</u> at 442-448.)  In response, Mr.

---

     [7]  In sum, the prosecutor argued that those five jurors were struck because they had answered Question 21 affirmatively *and* had volunteered an example of improper police conduct against black individuals, e.g., racial profiling, high profile instances of traffic stops involving black men and white officers (e.g., Rodney King and Johnny Gammage), or personal experiences with white police officers.  Leonard was struck because he lived in the same

Finkelstein, along with counsel for Gamble and McNair, expressed their opposing viewpoints in equal detail.  (Id. at 448-454.) The Court concluded that the prosecutor had satisfied the second step of Batson by offering a race-neutral explanation for striking Leonard and that the defendants had failed at step three to show purposeful racial discrimination.  The trial judge stated, "I think that the reasons given by [the prosecutor] for striking Mr. Leonard are acceptable, and they're not discriminatory, and I therefore allow the strike.  I think particularly so in view of the fact that [the other black male juror] is still on the jury."  (Tr. 3/22/00 at 454-455.)  Mr. Finkelstein then noted his objection on the record and moved for a mistrial, which the Court denied.  (Id. at 455.)

Contrary to Mr. Aiken's argument, there is no evidence in the transcript that the prosecutor "changed his argument to suit the questions that the Court had when the original exchange took place."  Rather, he simply explained his reasoning for striking jurors who answered Question 21 affirmatively.  Petitioner does not offer, and the Court cannot discern, the basis for Mr.

community as Mr. Aiken and stated that on several occasions, he or his children had been targeted by white police officers there.  (Transcript of Jury Selection, March 17, 2000, Docket No. 213, at 231-235.)  Although all the jurors said they could put aside their preconceived ideas on this point and judge the black defendants fairly, the prosecutor pointed out that while Batson and its progeny forbid striking a juror because of race, they do not forbid striking a juror who holds a particular opinion, even if that opinion may occur with greater frequency among individuals in a given racial group. (Tr. 3/22/00, at 443-445; see also, U.S. v. Uwaezhoke, 995 F.2d 388, 393 (3d Cir. 1993), cert. denied, 510 U.S. 1091 (1994), and Hopp v. City of Pittsburgh, 194 F.3d 434, 440 (3d Cir. 1999).

Aiken's statement that the prosecutor *changed* his arguments. Instead, it appears that during the second discussion, the prosecutor simply *extended* his argument by providing additional detail about why each specific juror was struck and about the relevant case law. Moreover, the record shows that Mr. Finkelstein vigorously and consistently argued for his client's position, both before the trial court and on appeal, but was not persuasive.[8]  Counsel has not failed to provide effective assistance if his motion is denied or the court rules in favor of the opposing party.  <u>United States v. Brown</u>, CA No. 00-562-SLR, 2003 U.S. Dist. LEXIS 1928, *11 (D. Del., Feb. 5, 2003) (*citing* <u>Strickland</u>, 466 U.S. at 676-677, for the principle that "it is not ineffective assistance of counsel if counsel does raise the objection but it is overruled by the court.")  Thus, to the extent Petitioner's motion to vacate is based on this argument, it must be denied.

  D. <u>Counsel Failed to Correct the Government's False and/or Grossly Misleading Opening and Closing Arguments</u>

   Although Mr. Aiken refers in the Petition and the Retort to "opening and closing arguments," his narrative in this

---

[8]  While the voir dire questionnaire was being compiled, the defense attorneys, including Mr. Finkelstein, objected to inclusion of this question, but were overruled by the Court.  (Transcript of Pretrial Hearing, March 14, 2000, Docket No. 211, at 86-87 and 212; *see also* Transcript of Jury Selection, March 15, 2000, Docket No. 212, at 103.)  On appeal, the Third Circuit considered Mr. Aiken's argument that the trial judge erred by allowing this question, but concluded that the Court did not abuse its discretion by doing so.  (Slip Op. at 7-9.)  The Appeals Court also found that the District Court did not err in concluding that the defendants had failed to show purposeful discrimination at the third step of the <u>Batson</u> challenge.  (<u>Id</u>.)

section mentions only the prosecutor's opening statement and then addresses allegedly perjured testimony by Joseph Ball. (Retort at 6-7.) Because Petitioner fails to explain how the prosecutor made false or grossly misleading arguments with regard to Ball's testimony, that testimony will be discussed in Section III.E. below. There is no discussion of closing arguments in either the Petition or the Retort.

Mr. Aiken argues that Mr. Finkelstein's performance was deficient because he failed to object to a single statement made by the prosecutor during his opening argument:

> . . . And he [Mr. Aiken] finally admits, "Yeah, Michele [Pearson] is my girlfriend." Michele, Blaine Gamble's cousin, he finally admits, "Yeah, I lied to you. Michele's my girlfriend."

(TT, March 23, 2000, Docket No. 216, at 516.)

Petitioner contends that this statement by the prosecutor made it appear that he had confessed to investigators not only that Pearson was his girl friend, but that he knew Gamble and that Gamble and Pearson were related. (Retort at 6.) According to Mr. Aiken, "when [this statement] is vocalized, it sounds as if Mr. Aiken made a confession of knowing both parties, even written with the proper punctuation it still appears to be the same." (Retort at 6.) Mr. Aiken argues that (1) at no point in the trial was testimony given that he knew his co-defendants and (2) the prosecutor's statement would tend to make the jury believe, incorrectly, that when Petitioner was first interviewed,

29

he confessed that he knew Gamble but that at trial, he denied any involvement.  (Id.)

The Government argues that Mr. Finkelstein would have had no grounds to object to this statement because the prosecutor was simply stating two uncontested facts: that Mr. Aiken originally lied about his relationship with Pearson and that Pearson was Gamble's cousin.  Furthermore, even if Petitioner were correct about an erroneous initial impression left by the prosecutor, the jury had already been instructed that such statements were not evidence.  (Govt. Resp. at 22.)

In assessing comments by a prosecutor, the narrow "relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"   Darden v. Wainwright, 477 U.S. 168, 181 (1986), quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  In order for the petitioner to prevail, the court must consider the conduct of the prosecutor in the context of the trial as a whole and conclude that the prosecutor's actions were so offensive that they resulted in a constitutional violation. Greer v. Miller, 483 U.S. 756, 766 (1987).

Even accepting Mr. Aiken's position that this single comment by the prosecutor could have been interpreted by the jury as a confession that he knew Gamble, Petitioner cannot point to any other statement during his trial which reinforced this point.

The prosecutor himself reminded the jury in his opening statement that his comments were not evidence.  (TT, 3/23/00, at 524.) Moreover, in his opening remarks to the jury, the trial judge stated:

> The first step in the trial will be the parties'
> opening statements outlining their respective cases.
> Just as the indictment is not evidence, neither are the
> opening statements evidence.  Their only purpose is to
> help you understand what the evidence will be and what
> the parties will try to prove.
>
> . . .
>
> After you have heard all of the evidence on both sides,
> I will instruct you about the rules of law that you are
> to use in reaching your verdict.  After hearing my
> instructions, the parties will each be given time for
> their final arguments.  I just told you that the
> opening statements are not evidence.  The same applies
> to the closing arguments, these are not evidence
> either.

TT, 3/22/00, at 489-491.)

The point was reiterated in the trial judge's final instructions to the jury, when he stated:

> Any statements, [or] objections to arguments made by
> the lawyers are not evidence in the case.  It is your
> recollection and interpretation of the evidence that
> controls, and what the lawyers have said or will say is
> not binding upon you.

(TT, 4/6/00, at 1371.)

A jury is presumed to have followed instructions given by the Court.  United States v. Givan, 320 F.3d 452, 462 (3d Cir. 2003).  Thus, it must be concluded that even if the prosecutor's statement were interpreted to imply that Mr. Aiken knew Gamble

prior to the bank robbery, in light of the fact that the jury
heard no testimony to support this statement – and in fact, heard
testimony from Shreve and Montgomery that would support the
opposite conclusion – Mr. Finkelstein's failure to object to the
statement neither prejudiced Petitioner's defense nor fell below
the standard of objectively reasonable conduct.

    E.    <u>Counsel Ill-Advised Petitioner of
His Right to Impeach Government Witnesses</u>

       Mr. Aiken claims he advised his counsel that two
Government witnesses had lied on the stand and gave Mr.
Finkelstein information that should have been used to impeach
them. (Petition, first unnumbered attachment, Ground 5.)
First, he "vehemently insisted" that Pasparage testified falsely
because she wanted him "incarcerated in an attempt to ward off a
murder investigation that Petitioner was trying to have done on
her."[9] (<u>Id.</u>)  Mr. Finkelstein's response was that if he were to
cross-examine her on her dishonesty, "a lot of other things would
come out." (<u>Id.</u>)  Petitioner contends that counsel ignored his

---

   [9] In a sidebar conference prior to Pasparage's testimony, it became
apparent that Pasparage and Mr. Aiken had a child who died at a young age.
Mr. Aiken apparently contacted the district attorney's office, insisting that
she be investigated in connection with this death. Mr. Finkelstein also knew
that Pasparage could have testified that Petitioner injured her, perhaps
breaking her arm some time in 1997. (TT, 3/30/00, at 1020-1021.)  Mr.
Finkelstein informed the Court that he intended to examine Pasparage on the
first point in an effort to show that she had a motive to be untruthful in her
testimony in order to get back at Petitioner. The Court cautioned him that
such testimony would not be relevant and might open the door to other
testimony damaging to Mr. Aiken, but concluded, "You do what you want. You
can ask the question if you want." (<u>Id.</u> at 1023-24.)  Mr. Finkelstein did not
subsequently pursue this line of questioning.

view that Pasparage's lies could be disproved with her medical
records and police reports.  "Mr. Finkelstein's strategy may have
been sound befor [sic] he had the means to impeach all of Ms.
Pasparage's testimony, but once he had gained enough information
to actually bring the truth to light then he should have
abandoned his privious [sic] strategy and presented these facts
to the . . . jury."  (Retort at 8.)

       Pasparage testified that she and Mr. Aiken had been boy- and
girlfriend between 1995 and early 1998.  During that time, they
lived together for about 18 months at two different locations in
Greensburg and Jeannette, Pennsylvania.  (TT, March 30, 2000,
Docket No. 219, at 1037-38.)  She further testified that while
they were living together, Mr. Aiken's brother, a pastor at the
Word of Victory's Ministry church, had visited them at home on
five or six occasions, that it was no secret they were living
together, nor that Pasparage and Mr. Aiken had a child together.
(Id. at 1039-40.)  She also admitted under cross examination by
Mr. Finkelstein that their break-up in early 1998 "was not . . .
very happy."  (Id. at 1044.)

       Mr. Aiken argues that Mr. Finkelstein knew he and Pasparage
had maintained separate residences throughout their relationship.
Petitioner claims Mr. Finkelstein was ineffective in that he
failed to impeach Pasparage on her statement that they lived
together, i.e., that "these facts should have been presented to

the record and Jury by means of Mr. Finkelstien [sic] impeaching Ms. Pasparage."  (Retort at 8.)

Even if Pasparage lied on the witness stand about their living arrangements at least 6 months before the robbery, such statements could not be considered material to Mr. Aiken's defense.  However, Mr. Finkelstein did impeach her testimony on far more relevant issues.  Cessar testified that Mr. Aiken told him that on the morning that his car disappeared from the Wal-Mart parking lot, he had left his keys in the car and the window open.  (TT, 3/30/00 at 1057.)  He further stated that he left the keys in the car on a regular basis because he was afraid of losing them while shopping.  (Id.)  Pasparage testified that she had never known him to leave the ignition keys in his car, that he never lost his keys in a store during the period she knew him well, and that he never seemed concerned about losing them.  (Id. at 1041.)  Mr. Finkelstein offered three witnesses to contradict her testimony on this point.  First, Mr. Aiken's mother testified that he "definitely" left his keys in his car. (TT, April 5, 2000, Docket No. 222, at 1266.)  A member Mr. Aiken's church testified similarly (id. at 1269), as did the godmother of one of his children (id. at 1274.)  Secondly, Mr. Finkelstein elicited testimony from those same three witnesses to the effect that they did not believe Pasparage was truthful.  (Id. at 1266, 1270, and 1275.)  Finally, he explicitly reminded the jury of these facts

34

during his closing and also of Pasparage's statement that her break-up with Petitioner was unhappy. (TT, 4/6/00, at 1442.) Thus, although he did not raise questions about Pasparage's truthfulness by impeaching her as Mr. Aiken suggested, he accomplished the same result by presenting witnesses to contradict her testimony on matters far more relevant and material to Petitioner's defense.[10]

Joseph Ball, the manager for the Wal-Mart store in Greensburg, testified that he had interacted with Mr. Aiken on the day of the robbery when Petitioner had asked to speak with him in order to compliment the exemplary service of a Wal-Mart employee. (TT, 4/3/00, at 1126-27.) He further testified that earlier the same morning, he saw Mr. Aiken talking to the Wal-Mart training coordinator, Rose Guierrez ("Guierrez.") According to Ball, Guierrez had approached him

> because the gentleman had wanted to be interviewed, and our hiring process is to basically – you know, standard procedure is to fill out an application and leave it until you're called. We do virtually no – at no time do we do an interview when someone fills out an application, but he had asked to be interviewed at that time; and she was explaining to him that we didn't do it that way, we go through a hiring committee and – a three-step hiring and interview process before we hire someone.

---

[10] Furthermore, outside the presence of the jury, Mr. Finkelstein had vigorously argued that Pasparage not be allowed to testify at all with regard to the question of whether he did or did not leave his keys in his car. (TT, 3/30/00, at 1016-1020.) After listening to the arguments of both sides, the Court ruled that she would be allowed to testify on this subject. (Id. at 1020.) Again, a decision by the court overruling counsel's objections does not show that his representation was ineffective.

(TT, 4/3/00, at 1128.)

Mr. Finkelstein did not cross examine Ball on the conversation with Guierrez.  According to Mr. Aiken, Francke had testified at the grand jury on April 20, 1999, that the FBI and state police investigators learned that Ms. Guierrez was not at work on July 3, therefore, Ball's testimony about his interaction with her had to be false and the Government knew it was false. (Petition at 6.)  Petitioner states that he told Mr. Finkelstein, "all you have to do is get [Guierrez's] work records and you can prove that [Ball] is lying."  Petitioner argues at length that the jury made its final determination of guilt based on Ball's "absolute lie" which had "a deep-seated impact on the jury" because if they believed that he was "in the back of the store demanding to be interviewed, and basically arguing with a woman because she will not give him an interview on the spot," he would appear "to be a desperate man as [opposed] to an ordinary shopper, and now everything that he does after that appears to be suspicious in the mind of a reasonable person or Juror."  By failing to question Ball on this obvious inaccuracy, Mr. Finkelstein thus allowed false testimony to influence the jury. (Retort at 6-7.)

As the Government points out, most of Ball's testimony was helpful to Mr. Aiken in that it established he was in the Wal-Mart at the time of the robbery and that he had two purposes for

36

going there that morning – to buy underwear for his daughter and to check on a job application that he had previously submitted. (Govt. Resp. at 23.)

The Court fails to understand how Mr. Finkelstein's failure to challenge Ball's testimony in any way prejudiced Mr. Aiken's defense.  Had Mr. Finkelstein compelled Ball to admit that he did not witness any interaction between Mr. Aiken and Guierrez or that it could have occurred on another day, he ran the risk of perhaps causing the jury to question other parts of his testimony.  *Compare,* Ouimette v. United States, CA No. 99-489-T, 2001 U.S. Dist. LEXIS 25316, * 12-*13 (D. R.I., June 21, 2001) in which defense counsel who did not object to a witness's prejudicial statements had the choice of moving to strike the statements and run the risk of calling undue attention to the comments or, alternatively, "let sleeping dogs lie" and focus the jury's attention on the issues on the case.

Unlike Pasparage's testimony about the living arrangements of herself and Mr. Aiken which could not be described as even indirectly material to the facts on which the jury convicted Mr. Aiken, Ball's testimony about the conversation between himself and Guierrez presents a closer question.  As Mr. Aiken argues, the jury may have believed that if Mr. Aiken did insist on an immediate interview, he could have been trying to establish a stronger alibi.  But had Mr. Finkelstein attempted to discredit

Ball's testimony as Mr. Aiken urges, the maneuver could have raised doubts in the jurors' minds about other parts of Ball's testimony which were otherwise quite favorable to Petitioner. Such a tactical decision is precisely the type of decision which the Court in Strickland held to be protected from second-guessing. Although Mr. Aiken may disagree with that decision, "mere criticism of a tactic or strategy is not in itself sufficient to support a charge of inadequate representation." United States v. Vincent, 758 F.2d 379, 382 (9th Cir.), *cert. denied*, 474 U.S. 838 (1985). Therefore, to the extent Petitioner's claim of ineffective assistance of counsel is based on Mr. Finkelstein's failure to impeach Ball and Pasparage on the points raised by Mr. Aiken, the motion to vacate is denied.[11]

---

[11] Mr. Aiken also claims that Ball's testimony should have been impeached to "show the Government's willingness to be dishonest to the Jury and knowingly offer perjured testimony." When the government used "known lies" to get a conviction, he was thereby deprived of his due process rights under the 14th Amendment to the Constitution. (Retort at 6.)

Since violation of Mr. Aiken's due process rights was not addressed even superficially in the Petition itself, such an argument must be considered a supplemental claim and thus governed by Rule 15(c)(1) or (c)(2) of the Federal Rules of Civil Procedure. "An amendment of a pleading relates back to the date of the original pleading when (1) relation back is permitted by the law that provides the statute of limitations applicable to the action, or (2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed.R.Civ.P.15(c). Section (c)(1) does not apply to § 2255 motions. Davenport v. United States, 217 F. 3d 1341, 1344, n.7 (11th Cir. 2000). Nor does an amendment to a § 2255 motion relate back if it adds a new theory to the case. United States v. Duffus, 174 F.3d 333, 337 (3d Cir.), *cert. denied*, 528 U.S. 866 (1999); *see also*, Dean v. United States, 278 F.3d 1218, 1222 (11th Cir. 2002) ("an untimely claim must have more in common with the timely filed claim than the mere fact that they arose out of the same trial.") Since Petitioner's newly stated claim is against the Government, not against his own counsel, and is based on a purported violation of his 14th Amendment rights, as opposed to his 6th Amendment rights, it cannot be said that this new claim relates back to the originally filed petition and thus must be considered untimely.

F.   <u>Counsel Did Not Effectively Handle Exculpatory Evidence</u>

Finally, Mr. Aiken claims that Mr. Finkelstein failed to obtain testimony or affidavits on his behalf from Gamble and McNair.  He states that "it was expressed by the co-defendants that they were willing to [testify], evan [sic] to the point of signing affidavits to present to the court."  (Petition, second unnumbered attachment, Ground 6.)  He acknowledges that his counsel had discussions with counsel for Gamble and McNair regarding their testimony, but states that Mr. Finkelstein "failed to obtain the affidavit that would have trumped any argument against their willingness to testify on behalf of Mr. Aiken."  (Retort at 8.)

According to Mr. Aiken, Gamble would have offered testimony to refute that of Scipio Griffin ("Griffin"), a paid government informant.  Griffin testified that while he was in Allegheny County Jail with Gamble for about three weeks in late 1999, Gamble told him that when he was stopped in New Jersey for a routine traffic violation, he had the gun used in the Greensburg bank robbery in his possession.  (TT, 3/27/00, at 771-774.)  Griffin also testified that Gamble asked him to contact a woman named Aquanetta[12] when he was released and suggest that she "go

---

[12]   Aquanetta Lawrence testified that she and McNair lived in the same apartment building in the summer of 1998.  (TT, 3/27/00, at 713-715.)  During that time, she saw him with Gamble outside the building on two or three occasions.  (<u>Id.</u> at 716-717, 722.)  Ms. Lawrence was not asked, nor did she volunteer, any information about Mr. Aiken.

on vacation" and not testify against him.  (Id. at 774.)  Griffin
subsequently asked to talk with someone about this information
and was interviewed by Francke.  (Id. at 777.)  On cross-
examination by Gamble's attorney at trial, Griffin stated that
Gamble told him about "a few other things that we're not
discussing, . . . he told me to get in touch with Aquanetta.  He
told me about his arrest.  He told me Muslims rob banks. . . .
That's about it."  (Id. at 789.)  At no point in his testimony
did Griffin mention Mr. Aiken or even allude to any statement
Gamble may have made about him.  Neither McNair nor Gamble
testified at trial.

Mr. Aiken attaches to his Retort an affidavit from Gamble
stating in relevant part that prior to trial, Mr. Finkelstein had
asked Gamble if he personally knew Mr. Aiken and, if he did not
know him before the events which led to their arrest, would he be
willing to testify in this regard before the jury.  (Retort,
Exhibit C, Affidavit of Truth by Blaine E. Gamble, "Gamble
Affidavit.")  Gamble states in his affidavit that he told Mr.
Finkelstein that he did not know Aiken and he was willing to so
testify.  (Id.)  The next portion of the affidavit somewhat
ambiguously states that Gamble

> further informed his attorney of record, that he also
> wanted himself (i.e., the attorney) to request of the
> Court that he (Gamble) be put on the witness stand;
> whereby to give truthful testimony in behalf of Mr.
> Akin's [sic].  The attorney failed to acknowledge or

mention Mr. Gamble's request before the Court (i.e.,
before, during or after the trial proceedings.)

(Gamble Affidavit.)

Gamble's proffered testimony would not have refuted anything
Griffin testified about Mr. Aiken because, as noted above,
Griffin never mentioned or alluded to Petitioner.  In fact, there
was no testimony by any witness that Gamble and Mr. Aiken were
acquainted prior to the robbery.  Had Gamble testified as Mr.
Aiken urges, he may have opened the door on cross-examination to
other statements he made to Griffin about Petitioner and McNair.
(TT, 3/27/00, at 740-741.)

When Mr. Aiken argued this same point before the Third
Circuit, the Court of Appeals concluded that "it was unclear
whether Aiken's co-defendants would testify for him and it was
equally unclear whether, if they did, their testimony would
exculpate him."  (Slip op. at 5-6.)  Moreover, the Court
concluded that "there was little indication that they would in
fact have testified, much less testified on Aiken's behalf."
(Id. at 6, n.2.)

A conclusory statement by a would-be witness such as Gamble
simply fails to support an ineffective assistance of counsel
claim.  Zettlemoyer v. Fulcomer, 923 F.2d 284, 298 (3d Cir. 1991)
(vague and conclusory allegations that some unspecified and
speculative testimony might have established the petitioner's
defense do not meet the petitioner's burden of proof under

Strickland.) Therefore, Mr. Aiken's final argument must be denied.

## IV.   CONCLUSION

Despite Mr. Aiken's arguments regarding the six instances in which he claims Mr. Finkelstein's performance was ineffective, the Court concludes that his Petition must fail.  "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693.   Review of the full record shows that Mr. Finkelstein vigorously advocated for Petitioner at every stage of the trial.  Based on the totality of the evidence before the jury regarding Mr. Aiken's participation in the bank robbery on July 3, 1998, any errors which Mr. Finkelstein may have made would not have altered the entire evidentiary picture; that is, the Court finds no reason to conclude that the jury's decision would have been different without those errors.

Because Mr. Aiken suffered no prejudice as a result of any alleged deficiencies in his counsel's representation, and because counsel's actions fell within the "wide latitude" afforded to attorneys making tactical decisions (Strickland, 466 U.S. at 689), Petitioner's motion under 28 U.S.C. § 2255 is denied.  In light of the conclusion that Mr. Aiken's claims are meritless, based on the written record in this case, the Court finds no reason to hold an evidentiary hearing.  Dawson, 857 F.2d at 928;

<u>Nembhard v. United States</u>,  No. 01-2579, 2002 U.S. App. LEXIS 27349, *9 (3d Cir., Dec. 13, 2002) (under 28 U.S.C. § 2255, a habeas corpus petitioner is entitled to a mandatory evidentiary hearing unless it is clear from the pleadings, files and records that he is not entitled to relief.)

An appropriate Order follows.